UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

**CURWOOD L. PRICE,**

    Plaintiff,        Case No. 05-71403-DT

vs.

                District Judge Bernard A. Friedman
                Magistrate Judge Steven D. Pepe

**PATRICIA CARUSO,**

    Defendant.
_____/

**REPORT AND RECOMMENDATION**

On April 11, 2005, Plaintiff, Curwood L. Price, a prisoner incarcerated in the Michigan Department of Corrections (MDOC), filed a complaint for damages and for declaratory and injunctive relief against Defendant, MDOC Director Patricia Caruso, pursuant to the Religious Land Use and Institutionalized Persons Act (RLUIPA).[1] All pretrial proceedings have been referred pursuant to 28 U.S.C. §636 (b)(1)(B). Defendant filed a motion for summary judgment on December 12, 2008 (Dkt. # 91). She raises two factual arguments related to the merits of he case which, for reasons stated below, are insufficient to warrant summary judgment. Defendant's third argument that she is entitled to immunity from damages suits under RLUIPA when sued in her official capacity is meritorious in light of an April 24, 2009, decision of the Sixth Circuit deciding an unresolved issue in this Circuit. *Cardinal v. Metrish*, 564 F.3d 794 (6th

---

[1]While Plaintiff in his claim does not specifically mention the RLUIPA in his complaint, his response to Defendants' Rule 12(b)(1) Motion to Dismissal for Lack of Subject Matter Jurisdiction asserted a RLUIPA claim and the facts of his complaint are sufficient to allege a RLUIPA claim. Therefore, this Court and the District Court have treated his claims as constituting a RLUIPA claim.

Cir. 2009).

For the reasons stated below, IT IS RECOMMENDED that Defendant's motion be GRANTED.

I.  **FACTUAL BACKGROUND**

Plaintiff's complaint alleges that the directive contained in February 17, 2004, and March 5, 2004, memos (the "Memos", Dkt. #1, Exhibit A & B) issued by a Dave Burnett, whom Plaintiff alleges was acting under the direction of Defendant, substantially burden his right to free 882 F.2d 1068 ly practice his Jewish faith and violate Sixth Circuit law set forth in *Whitney v. Brown*, (6th Cir. 1989).

In *Whitney*, prisoners held at the State Prison of Southern Michigan (SPSM) challenged a prison policy instituted in 1985 that prohibited prisoners from different areas within SPSM from meeting for weekly Sabbath services and annual Passover Seder. *Id.* at 1069. Jewish prisoners at SPSM had been congregating in SPSM's Central Complex for their religious services from the time SPSM opened until 1985 – forty-five years. *Id.* at 1070. In 1985, SPSM was divided into Central, South and North Complex. Each complex was separate and autonomous and each housed prisoners of different security levels. Central Complex was maximum security, South Complex minimum security and North Complex medium security. *Id.* at 1069-70.

The Jewish faith requires that Sabbath services be conducted with the Torah and a minyan – a gathering of no less than 10 persons over the age of 13. *Id.* at 1070. The Passover Seder does not require a Torah or a minyan, "but because [it] is a celebration of the exodus of the Jewish people out of Egypt, an individual's solo seder, or one conducted with only a very few worshippers, was characterized [ ] as 'a very miserable seder'". *Id.* The *Whitney* Plaintiffs

argued that preventing Jewish prisoners from the Central, North and South Complex from congregating did not allow a minyan for Sabbath Services and made celebrating the Seder "miserable" (at the time of the suit there were 4 Jewish practitioners in Central Complex and a total of 6 practitioners in the North and South Complex). *Id.* This, they argued, was a violation of their First Amendment right to free exercise of religion.

The Sixth Circuit held that the prison's "goal of minimizing mingling between inmates of different security levels is sound prison management", but held that this goal was not reasonably related to the restraints on Sabbath services. *Id.* at 1073-74. The Sixth Circuit also upheld the lower court's finding that the Passover Seder, as then modified, "fully accommodated the inmates' rights at a *de minimis* cost to the prison officials' valid penological interests and should be permitted". *Id.* The Court found that *under the then current conditions of the prison*, the transfer of 6 prisoners posed few problems for prison officials, but acknowledged that plans to further divide SPSM into separate facilities "might raise questions concerning inmates' intercomplex travel" when this occurred. *Id.* at 1075.

SPSM was broken down into various separate facilities including the relevant facilities – Parnall Correctional Facility (referred to by the parties as "SMT" which still operates), which houses Level I inmates and Southern Michigan Correctional Facility (referred to by the parties as "JMF"), which houses Level II and IV inmates (Dkt. # 23, p. 3). JMF was eventually closed on November 17, 2007.[2]

Plaintiff was housed in JMF at the time he filed this suit. He challenges the following

---

[2] http://www.michigan.gov/corrections/0,1607,7-119-1381_1388-5357--,00.html (last checked July 16, 2009)

provisions of the new policy contained in the Memos: (a.) prisoners from JMF no longer being transported to SMT for Jewish services and/or Seder,[3] (b.) food items being provided by the facility for addition to Seder meal plates (instead of a fully catered meal) and (c.) no outside guests for Seder dinner.  Plaintiff alleges that he cannot properly observe the weekly Sabbath and annual Passover Seder unless the MDOC allows intercomplex travel between SMT and JMF for weekly Sabbath services.  Plaintiff maintains that the *Whitney* Court's directive is still valid despite the changes to the prison and requires intercomplex travel for Jewish religious services, a fully catered Seder dinner and 2 guests per prisoner for Seder dinner.

In her summary judgment motion, Defendant argues that (a) there are sufficient numbers of Jewish prisoners in each facility to hold services, (b) the changes in the prison were contemplated by the *Whitney* Court and under the new situation *Whitney* can be distinguished, and (c) Defendant is entitled to immunity from damages suits under RLUIPA when sued in her official capacity.

## II.   PROCEDURAL HISTORY

On April 11, 2005, Plaintiff filed his Complaint. On October 28, 2005, Defendant filed her Motion for Dismissal for Lack of Subject Matter Jurisdiction (Dkt. # 23).  On April 21, 2006, this Court issued a Report and Recommendation proposing that claims for injunctive relief were moot but that Plaintiff could pursue claims for monetary damages under RLUIPA against Caruso in official capacity and under 1983 in her individual capacity (Dkt. # 28).  Both Plaintiff and Defendant filed objections to the Report and Recommendation.  On September 8, 2006, the

---

[3] The Memos state that this new policy satisfied the intent of *Whitney* because sufficient numbers of Jewish prisoners were now housed at SMT to meet a minyan (Dkt. #1, Exhibit A).

District Court determined that Caruso may be liable under RLUIPA for damages in her official capacity, but that claim under 1983 was not presented. (Dkt. # 40)[4] The Court also agreed with Report and Recommendation that Plaintiff created a factual dispute preventing summary judgment through evidence that "[f]rom the time the memos were issued . . . there has never been a Seder Dinner" and "there were **NEVER more than 6 prisoners attending Jewish Services.**" (*Id.* (emphasis in original))

## III.   LEGAL STANDARD

Under Fed. R. Civ. P. 56, summary judgment is to be entered if the moving party demonstrates there is no genuine issue as to any material fact. The Supreme Court has interpreted this to mean that summary judgment should be entered if the evidence is such that a reasonable jury could find only for the moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The moving party has "the burden of showing the absence of a genuine issue as to any material fact." *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970); *see also, Lenz v. Erdmann Corp.*, 773 F.2d 62 (6th Cir. 1985). In resolving a summary judgment motion, the Court must view the evidence in the light most favorable to the non-moving party. *See Duchon v. Cajon Co.*, 791 F.2d 43, 46 (6th Cir. 1986); *Bouldis v. United States Suzuki Motor Corp.*, 711 F.2d 1319 (6th Cir. 1983). Once the moving party has satisfied the initial burden, the non-moving party "may not rest upon the mere allegations or denials of the adverse party's pleadings, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).

---

[4]Because Defendant supported her Motion to Dismiss with affidavits, both this Court and the District Court treated Defendant's Motion to Dismiss as a motion for summary judgment and reviewed the Motion under the standards of Fed. R. Civ. P. 56.

The non-moving party's failure to "make a sufficient showing to establish the existence of an element essential to that party's case, and on which the party will bear the burden of proof at trial" will result in dismissal of the non-moving party's claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

## IV.   ANALYSIS

Defendant's summary judgment motion reiterates several arguments Defendant first raised in her Motion to Dismiss. Defendant claims that restricting intercomplex travel for Sabbath services does not violate RLIUPA because sufficient Jews inhabit each complex to support separate minyans and that changes contemplated by the *Whitney* decision render the decision inapplicable to current prison conditions. Additionally, Defendant asks this Court to reconsider its prior decision on whether she is immune from damages suits under RLUIPA in light of two recent decisions in the Western District of Michigan.

### A. The Sufficiency of Jewish Prisoners in Each Facility to Hold Separate Sabbath Services.

In her summary judgment motion, Defendant argues that under current prison conditions, prohibiting travel between complexes for Sabbath services does not impose a substantial burden on the exercise of Jewish prisoners' religious beliefs in violation of RLUIPA because sufficient Jewish prisoners inhabit each complex to form separate minyans.

This Court previously rejected this same argument in the Report and Recommendation on Defendant's Motion to Dismiss:

> "Yet, Plaintiff alleges that there were not enough Jewish prisoners attending services at JMF to allow him to participate in Sabbath services with a minyan. Defendant did not provide information regarding how many prisoners that

> identified themselves as Jewish at JMF actually attended Sabbath services. Therefore, a question of fact remains as to whether Plaintiff was entitled to further or continuing accommodations to ensure that a minyan was present in the facility in which he was housed despite the number of eligible Jewish prisoners in that facility."

(Dkt. # 28 at 10-11).

The District Court agreed that genuine issues of material fact existed on the issue whether the policy of precluding intercomplex travel for Sabbath services imposed a substantial burden on Jewish prisoner's ability to exercise their religious beliefs:

> [W]hen the facts are taken in the light most favorable to the non-moving party, the Plaintiff creates a factual dispute that prevents summary judgment. Plaintiff states that "[f]rom the time the memos were issued . . . there has never been a Seder Dinner, nor have there been enough Jewish Prisoner[s] present at JMF to hold a Sabbath Service." (Pl.'s Objections to Mag. J.'s R&R, 5.) Plaintiff explains, in partially underlined and bold text, that "there were **NEVER more than 6 prisoners attending Jewish Services.**" (*Id.*) Therefore, a genuine issue of material fact exists.

(Dkt. # 40 at 12-13).

Defendant raises no new facts suggesting that these rulings should be reconsidered. For example, Defendant has not proffered any affidavit or documentary evidence indicating that Jews in each complex were able to form minyans for Sabbath services. Instead, Defendant relies exclusively on several recent cases addressing whether prisons can cancel religious services when no one from outside the prison volunteers to conduct them. *See Baranowski v Hart*, 486 F3d 112, 124 (5th Cir. 2007); *Adkins v Kaspar*, 393 F3d 559 (5th Cir. 2004); *Farnsworth v Baxter*, No. 03-2950, 2008 U.S. Dist LEXIS 69236 (W.D . Tenn. September 12, 2008). In each of these cases, the courts found that prisons did not substantially burden prisoners' exercise of their religious beliefs when the prisons did not hold religious services in the absence of outside

volunteers to lead them.

Defendant argues by extension that the obstacle to creating a minyan was the lack of Jewish inmates who volunteered to attend Sabbath services, not the rule prohibiting the transfer of prisoners from one facility to another. Defendant contends that under these decisions it cannot be held liable for failing to identify and recruit Jewish prisoners in each facility to attend in sufficient numbers to form a minyan. Defendant concludes that unless a prison policy directly prohibits religious congregation, the lack of sufficient numbers will not implicate the policy.

Defendant extends these cases too far. *Adkins, Baranowski* and *Farnsworth* stand for the proposition that a prison cannot be held liable for failing to ensure volunteers are available to conduct a religious service. Each court emphasized that prisoners were prevented from congregating not by prison policies, but by something outside the control of prison officials – the lack of outside volunteers. For example, the *Farnsworth* court observed: "At worst, [d]efendant has undertaken what [p]laintiff contends is an insufficiently diligent search for a volunteer to conduct a Messianic Jewish Sabbath service at the WTSP [West Tennessee State Penitentiary]." 2003 U.S. Dist. LEXIS 69236, at *31.

In this case, by all appearances, there were sufficient numbers of willing Jewish prisoners spread among the three facilities to form a minyan. For approximately 65 years, the Jewish prisoners in these facilities were permitted to and did assemble for Sabbath services. The new 2004 policy *did* prevent these prisoners from congregating. Yet, unlike *Adkins* and *Baranowski*, Defendant has not presented any security-related justification for this policy. In light of the evidence Plaintiff has presented about the inability to raise a minyan since the new policy was implemented, genuine issues of material fact remain whether the restriction on intercomplex

travel substantially burdened Plaintiff's religious freedom in violation of RLUIPA.

### B. The Change in Prison Conditions.

Defendant claims that changes in prison conditions warrant revisiting this Court's prior decision in this case. Defendant notes that the *Whitney* court limited its holding only to those conditions of the prison *at the time* of the complaint in the mid-1980s. Indeed, the *Whitney* court stated that "[t]he inmates acknowledge that plans to divide the SPSM into separate facilities one day, apparently now five or six years down the road, might raise other questions concerning inmates' intercomplex travel." 882 F.2d at 1072. Defendant asserts that those anticipated changes have arrived in the form of additional Jewish prisoners.

The changed conditions Defendant cites do not warrant deviating from the prior opinions in this case. The changes the *Whitney* court anticipated related not to an increase in the number of Jewish prisoners, but to a prison reorganization that had the potential to increase the burden of transferring prisoners between complexes. Although the expected reorganization has occurred, Defendant has presented no affidavit, testimony, documents or other evidence suggesting that those structural changes make intercomplex travel for Sabbath services any more burdensome for the prison.

In contrast, Plaintiff has presented evidence suggesting that intercomplex travel would *not* be any more difficult now than at the time of *Whitney*. More specifically, Plaintiff has introduced an affidavit explaining that very little of the prison's configuration had changed since the *Whitney* opinion was issued. (Dkt. # 95 Exhibit 4) In fact, according to the affidavit, intercomplex transfers only require travel through one additional gate. (*Id.*) Accordingly, the intercomplex travel is routinely allowed for concerts, legal writers, hospital workers and medical

transportation. (Dkt. # 95 Exhibit 4 & 5)  Of all this traffic, the 2004 memos halted *only* the Jewish prisoners' travel for Sabbath services. (Dkt. # 95 Exhibit 4 & 5)

As for the single change that Defendant cites in support of her argument that *Whitney* no longer applies – the increase in Jewish prisoners in each complex – this change is unrelated to prison security issues *Whitney* was concerned about.  The increase in Jewish prisoners might be relevant if it were linked to an increase in Jewish prisoners regularly attending weekly Sabbath services sufficient in number at each institute to constitute a minyan.   In the absence of such a showing, there are genuine issues of material fact whether restricting intercomplex travel substantially burdened their ability to practice their faith.

In *Whitney*, the Sixth Circuit warned against accepting conclusory arguments from Prison officials on the burden imposed by allowing prisoners to exercise their religious beliefs:

> Perhaps the greatest weakness in the prison officials' arguments is their misunderstanding of *Turner* and *O'Lone* as holding that federal courts will uphold prison policies which can somehow be supported with a flurry of disconnected and self-conflicting points. They seem to read *Turner* and *O'Lone* as saying that anything prison officials can justify is valid because they have somehow justified it. In an argument typical of their conclusory approach to the problem, the prison officials maintain that the Passover Seders should be banned because "any time the normal routine of an institution is altered, the good order and security of that facility are potentially compromised." The fact remains, however, that prison officials do not set constitutional standards by fiat.
>
> * * *
>
> We fail to see how any of the security interests raised to justify the challenged ban suddenly became threatened in 1985, after forty-five years of weekly inmate travel to Sabbath services.

882 F.2d at 1073.

Despite this admonition, Defendant lacks any factual support for her contention that changed conditions undermine *Whitney* or prior rulings in this case.  Accordingly, it appears that

genuine issues of material fact continue to exist on this issue.

### C. Sovereign Immunity.

In addition to her arguments about whether the new policy against intercomplex travel for Sabbath services violates RLUIPA, Defendant reiterates her contention that she is immune from suits for damages against her in her official capacity.  Because MDOC is an entity which is funded with public funds from the Michigan State Treasury, the Eleventh Amendment often bars suit against MDOC.  *Richard v. Michigan Dept. of Corrections,*  22 Fed. Appx. 563, 564 (6th Cir. 2001) (citing *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 66 (1989); *Alabama v. Pugh*, 438 U.S. 781, 782 (1978); *Abick v. Michigan*, 803 F.2d 874, 876-77 (6th Cir.1986)).  Further, individuals sued in their official capacities stand in the shoes of the entity they represent.  *Kentucky v. Graham*, 473 U.S. 159, 165 (1985) (citing *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 690 n. 55 (1978) ("Official capacity suits  . . .   represent only another way of pleading an action against an entity of which an officer is an agent.")); *Matthews v. Jones*, 35 F.3d 1046, 1049 (6th Cir.1994) ("A suit against an individual in his official capacity is the equivalent of a suit against the governmental entity."); *Alkire v. Irving*, 330 F.3d 802, 810 (6th Cir. 2003).

The Eleventh Amendment does not automatically provide a shield of sovereign immunity from claims arising in all instances.  The state may waive its Eleventh Amendment immunity by consenting to suit (*Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 99 (1984)), and acceptance of federal funding can, in certain instances, constitute a waiver of a state's sovereign immunity ( *South Dakota v. Dole*, 483 U.S. 203, 207 (1987)(Congress may condition its grant of funds to the States upon their taking certain actions and acceptance of the funds

entails an agreement to the actions)).

This court determined in ruling on Defendant's motion to dismiss that Plaintiff could assert a claim against defendant for money damages under RLUIPA. (Dkt. # 28, at 8-9; Dkt. # 40, at 10) At the time, this issue had not been addressed by the Sixth Circuit. Since those rulings, however, the Sixth Circuit decided unequivocally that states, and their prison wardens when sued in their official capacity, may not be sued for monetary damages under RLUIPA. *See Cardinal v. Metrish*, 564 F.3d 794 (6th Cir. 2009). This Court must adhere to the Sixth Circuit's ruling in *Cardinal*. Because the RLUIPA damages claim against Defendant Caruso in her official capacity is the only remaining claim in this case, summary judgment is properly entered in Defendant's favor.

## V.    RECOMMENDATION

For the reasons stated above, IT IS RECOMMENDED that Defendant's Motion be GRANTED. The parties to this action may object to and seek review of this Report and Recommendation, but are required to file any objections within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Sec'y of Health and Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local*, 231, 829 F.2d 1370,1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this

Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than twenty (20) pages in length unless by motion and order such page limit is extended by the Court. The response shall address specifically, and in the same order raised, each issue contained within the objections.

Dated: July 16 , 2009             s/Steven D. Pepe
Ann Arbor, Michigan            United States Magistrate Judge

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing **REPORT AND RECOMMENDATION** was served on the attorneys and/or parties of record by electronic means or U.S. Mail on July 16, 2009.

           s/Deadrea Eldridge
           Generalist Deputy Clerk